## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHRISTOPHER DANUSIAR** | ) Case Number  1:20-cv-1477 |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| | ) |
| **Auditchain USA, Inc.,** a Delaware | ) |
| corporation, **Matreya.io, LLC** a Delaware | ) |
| limited liability corporation, and | ) |
| **Jason M. Meyers**, individually | ) **Jury Trial Demanded** |
| Defendants. | ) |

## COMPLAINT

1.        Plaintiff Christopher Danusiar files this lawsuit against his former employers, Auditchain USA, Inc. ("Auditchain"), Matreya.io, LLC ("Matreya") (Auditchain and Matreya hereinafter referred to interchangeably as the "Company") and individually against Jason M. Meyers (collectively "Defendants"). Mr. Meyers hired Mr. Danusiar as the Director and Chief Executive Officer of the Company, and his employment was governed by the terms of his Employment Agreement. Defendants breached the Employment Agreement by failing to pay Mr. Danusiar his earned compensation and other amounts owed under the Employment Agreement. Such misconduct violates the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS § 115 *et. seq.*, the New York Labor Law ("NY Labor Law"), N.Y. Labor Law § 190 *et seq.*, and constitutes claims for breach of contract, and breach of the implied covenant of good-faith and fair dealing.

## THE PARTIES

2.        Christopher Danusiar is, and at all times relevant to this Complaint was, a resident of Illinois. Mr. Danusiar lives in Wheaton, Illinois and pays Illinois income taxes.

3.      Auditchain USA, Inc. is a Delaware corporation that does, and at all times relevant to this Complaint did, conduct business in New York City, New York. Auditchain USA, Inc. executed the Employment Agreement.

4.      Matreya.io, LLC is Delaware limited liability corporation that does, and at all times relevant to this Complaint did, conduct business in New York City, New York. Matreya.io, LLC paid Mr. Danusiar's wages owed under the Employment Agreement during his employment. Mr. Meyers developed the services to be sold through Auditchain USA, Inc. under Matreya.io, LLC and hired Mr. Danusiar to provide services for both companies.

5.      Mr. Meyers is an executive, owner, and founder of, and exclusive decision-maker for, Auditchain USA, Inc., and Matreya.io, LLC. Mr. Meyers is domiciled in New York.

6.      Defendants have an office in, do business in, and operate in New York City, New York. Plaintiff performed work for Defendants out of Defendants' office in New York City, New York during his employment with Defendants.

## VENUE AND JURISDICTION

7.      Plaintiff brings his Complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

8.      Venue is proper in the Southern District of New York because Defendants operate out of New York City, New York and operated out of New York City, New York at all times relevant to this Complaint, and Defendants' misconduct alleged in the Complaint occurred in New York City, New York.

## FACTUAL BACKGROUND

9.      Defendants failed to pay Mr. Danusiar all of his earned wages under the Employment Agreement, including his salary, his bonus payment, and his separation pay.

Defendants also failed to reimburse Mr. Danusiar for all business expenses he incurred on Defendants' behalf.  And Defendants misclassified Mr. Danusiar and owe him additional money for employment taxes Defendants failed to withhold.

10.     Mr. Meyers developed the idea for a decentralized continuous audit and reporting protocol ecosystem through Matreya.io LLC, which is now branded and communicated as Auditchain USA, Inc.

11.     Mr. Meyers met Mr. Danusiar in early 2018. Mr. Meyers began recruiting Mr. Danusiar to provide services for Matreya and Auditchain when he learned of Mr. Danusiar's extensive background in assurance and accounting technology.

12.     Mr. Danusiar is a highly-regarded business, technology, and global transformation leader with over thirty years of relevant experience that helped further Mr. Meyers's blockchain ecosystem concept.

13.     When Mr. Meyers recruited him, Mr. Danusiar was working for Ernst & Young ("EY") as a Deputy Technology Officer.

14.     At the time he left his employment with EY on September 4, 2018, EY was paying Mr. Danusiar an annual salary of $405,000 plus an annual bonus equal to approximately $45,000.

15.     When Mr. Meyers first reached out to Mr. Danusiar, Mr. Danusiar expressed that he was content in his role with EY.

16.     However, Mr. Meyers continued to recruit Mr. Danusiar through early August, offering him the role of Auditchain's Chief Executive Officer because, as Mr. Meyers stated, the Company had significant growth potential, substantial funding, and needed a "professional and well-respected CEO."

17.     Mr. Danusiar finally accepted Mr. Meyers's offer. However, Mr. Danusiar's acceptance was based upon false and incomplete information because he later discovered that Mr. Meyers misrepresented and concealed material information related to the Company's funding, revenue potential, and ability to pay him the compensation he was promised in the Employment Agreement. Mr. Danusiar could not have discovered the false information even with due diligence.

18.     Auditchain was incorporated in Delaware on May 11, 2018, although all of Auditchain's assets remain with Matreya.

19.     Mr. Meyers hired Mr. Danusiar to assist with the transition from Matreya to Auditchain with the understanding the Mr. Danusiar would be providing services for both companies.

20.     Mr. Danusiar's title was Director and Chief Executive Officer and his employment was effective on September 5, 2018.

21.     Mr. Danusiar was heavily involved in the drafting and review of all relevant documents to transition all assets and intellectual property related to the decentralized continuous audit and reporting protocol ecosystem from Matreya to Auditchain.

22.     All work Mr. Danusiar performed for Matreya was simultaneously performed for Auditchain, and vice versa.

23.     Mr. Danusiar's employment was governed by a Term Sheet—which Mr. Meyers titled the "Employment Agreement." A true and accurate copy of the fully executed term sheet is attached hereto as Exhibit A.

24.     Page 1 of the Term Sheet (the "Employment Agreement") states: "The parties agree to negotiate in good faith such definitive documentation containing terms consistent with the provisions set forth herein as soon as reasonably practicable after the date hereof; provided,

however, that if such agreements are not entered into between the parties this Term Sheet shall continue in full force and effect."

25.      Mr. Danusiar and Mr. Meyers executed the Employment Agreement on August 17, 2018.

26.      Mr. Danusiar's responsibilities, as set forth in the Employment Agreement, were to "oversee the day to day activities of all operations of the Company and have the duties, authorities and responsibilities of persons in similar capacities in similarly sized companies."

27.      During his employment, Mr. Danusiar tirelessly performed the duties expected of a Director and Chief Executive Officer, working long hours and carrying out all tasks required of him.

28.      The Employment Agreement permitted Mr. Danusiar to "work remotely or from any Auditchain office location as desired."

29.      Mr. Danusiar performed his duties from the Company's office in New York City, New York or remotely from his home in Wheaton, Illinois.

30.      Mr. Danusiar believed in, and was dedicated to, the vision Mr. Meyers had for the Company. However, he quickly learned that he and others were misled about the funding and future of Auditchain.

31.      Upon information and belief, Mr. Meyers exaggerated the Company's value by multiple millions of dollars when communicating with investors.

32.      On or around March 6, 2018, Mr. Danusiar learned that Mr. Meyers may have extended Simple Agreements for Future Token ("SAFT") to United States citizens in violation of federal laws.

33.     Mr. Meyers had assured Mr. Danusiar multiple times that Auditchain intended to engage only with third parties who were able to comply with KYC ("Know Your Customer") and AML ("Anti-Money Laundering") requirements.

34.     This new information regarding the unlawful SAFTs was therefore contrary to every representation Mr. Meyers made to Mr. Danusiar regarding the Auditchain SAFTs, ICO or TGE.

35.     Upon information and belief, Mr. Meyers is also using significant amounts collected from Auditchain investors for personal use and to fund apartments in SoHo, New York, and Zug, Switzerland based on the discrepancy in amounts Mr. Meyers collected from investors, on the one hand, and amounts recorded in accounting statements for Auditchain or Matreya, on the other hand, of approximately One Million to One Million Five Hundred Thousand Dollars.

36.     By the time Mr. Danusiar learned of Mr. Meyers's unlawful conduct, Mr. Meyers had stopped paying Mr. Danusiar's salary in violation of the terms of the Employment Agreement and applicable wage laws.

37.     The lack of transparency and apparent impropriety, in conjunction with the Company's ongoing breach of his Employment Agreement, led Mr. Danusiar to terminate his employment for Good Reason effective March 20, 2019.

38.     Mr. Danusiar provided Mr. Meyers, Ben Panter, Edward Little, and Michael Di Giovanna with his Notice of Termination for Good Reason ("Notice") on February 18, 2019.

39.     Mr. Danusiar stated that the Company was in continuous material breach of the Employment Agreement and was engaged in acts that gave rise to a Good Reason event.

40.    Mr. Danusiar further stated, in compliance with the notice requirements set forth in the Employment Agreement, that he was terminating his employment for Good Reason "if the Company [did] not fully cure all circumstances."

41.    Upon learning of Mr. Meyers' potentially unlawful conduct, Mr. Danusiar accelerated his Termination for Good Leave to be effective on March 8, 2019.

42.    Mr. Danusiar made a report about Mr. Meyers's conduct to the United States Securities and Exchange Commission on May 7, 2019 upon learning that he could make a whistleblower tip.

43.    The Company did not cure or even attempt to cure its continuing breach upon receipt of Mr. Danusiar's Notice of Termination for Good Reason.

44.    Under the Employment Agreement, Mr. Danusiar's salary was contracted to be $225,000 from September 2018 to September 2019 and $325,000 or more every year thereafter.

45.    Mr. Danusiar received payments from Matreya for his first three months of his employment.

46.    After the first three months of his employment, the Company subsequently failed to pay him *any* wages.

47.    The Company owes Mr. Danusiar wages for more than three months during which he worked and earned his salary under the terms of the Employment Agreement.

48.    The Company also owes Mr. Danusiar reimbursements for business expenses equal to approximately $16,500, which he paid out-of-pocket.

49.    The Company further misclassified Mr. Danusiar as an independent contractor in violation of the Internal Revenue Code and paid him with IRS Form-1099 wages.

50.     In addition to his unpaid salary and reimbursement for his incurred expenses, the Company owes Mr. Danusiar other substantial compensation pursuant to the terms of the Employment Agreement.

51.     The Employment Agreement states that if Mr. Danusiar's employment is terminated for Good Reason within 120 days of the TGE (via ICO or IEO) of the Auditchain AUDT token, he is entitled to a bonus equal to a minimum of $100,000.

52.     Mr. Danusiar is entitled to the $100,000 bonus because the AUDT TGE occurred on June 14, 2019, which was within the 120-day period.

53.     Under the Employment Agreement, Mr. Danusiar is also entitled to Termination for Good Reason fees in "an aggregate amount equal to the base salary that would have been paid to [him] had his employment continued under the terms of [the Employment Agreement] for one year following the date of termination (taking into account the mandatory increase upon the first anniversary of [his] start date)."

54.     Mr. Danusiar is therefore owed Termination for Good Reason fees equal to approximately $114,657.84 for work performed from March 9, 2019 through his first anniversary, September 4, 2019, and $175,493.39 for work performed from September 4, 2019 through March 9, 2020 — a total amount equal to $290,151.23.

55.     On March 21, 2019, Mr. Danusiar sent the Company an invoice for the total amounts owed.

56.     To date, the Company has not paid Mr. Danusiar any of his unpaid wages, his Termination for Good Reason fees, his AUDT TGE bonus, or reimbursed any of his incurred expenses.

57.      Under the terms of the Employment Agreement, Mr. Danusiar was also promised up to 2,000,000 AUDT tokens, which at the IEO were priced at Twenty Cents ($0.20) per AUDT token, and an option to own Ten Percent (10%) of Auditchain USA, Inc. for a payment of One Hundred Dollars ($100).

58.      Mr. Danusiar further seeks approximately $15,000 for employment taxes not withheld by the Company in violation of the Internal Revenue Code.

## COUNT I
## VIOLATIONS OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (AGAINST ALL DEFENDANTS)

59.      Plaintiff reincorporates and re-alleges the allegations in paragraphs 1 through 57 as if fully set forth herein.

60.      At all relevant times for this Complaint, the IWPCA was in effect.

61.      At all relevant times for this Complaint, Plaintiff was performing services for the Company and paying employment taxes in Illinois.

62.      Plaintiff was employed by Defendants during the relevant time period.

63.      Section 3 of the IWPCA provides that Defendants must pay Plaintiff his wages at least semi-monthly: "Every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." *See* 820 ILCS § 115/3.

64.      The IWPCA further mandates that Defendants pay Plaintiff all compensation under the terms of the Parties' agreement.

65.      Section 13 of the IWPCA imposes personal liability on Mr. Meyers as an officer and agent of the Company: "[A]ny officers of a corporation or agents of an employer who knowingly violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS § 115/13.

66.     Mr. Meyers is individually liable because he knowingly permitted violations of the IWPCA to occur.

67.     Defendants failed to pay Plaintiff his earned compensation, due and owing.

68.     Based on the foregoing, Defendants violated the IWPCA.

69.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered and continues to suffer lost wages and other damages.

70.      Defendants are subject to a two percent (2%) interest per month penalty, as well as attorneys' fees and costs expended in pursuit of the unpaid compensation owed, for violations of the IWPCA. 820 ILCS 115/14(a).

## PRAYER FOR RELIEF

71.     WHEREFORE, Plaintiff prays that this Court enter judgment in his favor and against Defendants as follows:

A.     That a finding be entered that Defendants violated the IWPCA;

B.     That Plaintiff be awarded compensatory damages to account for his lost income and unreimbursed business expenses;

C.     That Plaintiff be awarded statutory damages of two percent (2%) of the amount of any such underpayments for each month following the date of payment during which such underpayments remained unpaid;

D.     That Plaintiff be awarded interest on all amounts awarded;

E.     That Plaintiff be awarded his costs of maintaining this action, including reasonable attorneys' fees, together with all costs and expenses of suit; and

F.     That Plaintiff be awarded any and all other forms of relief this Honorable Court deems just and appropriate.

10

**COUNT II**
**IN THE ALTERNATIVE TO COUNT I**
**VIOLATIONS OF THE NEW YORK LABOR LAW**
**(AGAINST ALL DEFENDANTS)**

72.　　　　Plaintiff reincorporates and re-alleges the allegations in paragraphs 1 through 57 as if fully set forth herein.

73.　　　　At all relevant times for this Complaint, the NY Labor Law was in effect.

74.　　　　Plaintiff's Employment Agreement states that the laws of the State of New York are applicable to this matter.

75.　　　　Plaintiff was employed by Defendants during the relevant time period.

76.　　　　The New York Labor Law requires Defendants to pay Plaintiff his wages "not later than the regular pay day for the pay period during which termination occurred" upon termination of Plaintiff's employment. N.Y. Lab. Law § 191(3).

77.　　　　Defendants did not pay Plaintiff any of his earned and unpaid compensation upon termination of his employment.

78.　　　　The New York Labor Law imposes personal liability on Mr. Meyers, defining "employer" as "any *person*, corporation, limited liability corporation . . ." (emphasis added). N.Y. Lab. Law § 190(3).

79.　　　　Mr. Meyers is individually liable because he knowingly permitted violations of the New York Labor Law to occur.

80.　　　　Defendants failed to pay Plaintiff his earned compensation.

81.　　　　Based on the foregoing, Defendants violated the New York Labor Law.

82.　　　　As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered and continues to suffer lost wages and other damages.

11

83.     Defendants may be subject to liquidated damages equal to one hundred percent (100%) of wages owed, prejudgment interest, as well as attorneys' fees and costs expended in pursuit of the unpaid compensation owed. N.Y. Lab. Law § 198(1-a).

## PRAYER FOR RELIEF

84.     WHEREFORE, Plaintiff prays that this Court enter judgment in his favor and against Defendants as follows:

A.  That a finding be entered that Defendants violated the New York Labor Law;

B.  That Plaintiff be awarded compensatory damages to account for his lost income and unreimbursed business expenses;

C.  That Plaintiff be awarded liquidated damages equal to one hundred percent (100%) of the amount of any wages found to be due;

D.  That Plaintiff be awarded interest on all amounts awarded;

E.  That Plaintiff be awarded his costs of maintaining this action, including reasonable attorneys' fees, together with all costs and expenses of suit; and

F.  That Plaintiff be awarded any and all other forms of relief this Honorable Court deems just and appropriate.

## COUNT III
## BREACH OF CONTRACT
## (AGAINST ALL DEFENDANTS)

85.     Plaintiff reincorporates and re-alleges the allegations in paragraphs 1 through 83 as if fully set forth in this paragraph.

86.     Under the executed Employment Agreement, Plaintiff is entitled to $290,151.23 for Termination for Good Reason fees, $100,000 for the AUDT TGE bonus, $72,914.29 for unpaid

wages and reimbursement for business expenses incurred, and approximately $15,000 for employment taxes not withheld by the Company in violation of the Internal Revenue Code.

87.    Plaintiff fully performed his duties and obligations under the terms of the Employment Agreement.

88.    Defendants have failed to pay Plaintiff his promised amounts under the Employment Agreement.

89.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial economic harm and other damages.

## PRAYER FOR RELIEF

90.    WHEREFORE Plaintiff prays for judgment in his favor and against Defendants, and for the following relief:

A.    That a finding be entered that Defendants breached the Employment Agreement;

B.    That Plaintiff be awarded damages in an amount equal to the unpaid amounts due and owing;

C.    That Plaintiff be awarded his costs of maintaining this action, including reasonable attorneys' fees, together with all costs and expenses of suit; and

D.    That Plaintiff be awarded such other and further relief as this Honorable Court deems necessary.

## COUNT IV
## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (AGAINST ALL DEFENDANTS)

91.    Plaintiff reincorporates and re-alleges the allegations in paragraphs 1 through 89 as if fully set forth in this paragraph.

13

92.     The covenant of good faith and fair dealing is implied in, and central to, every contract.

93.     Under the Employment Agreement, Plaintiff is entitled to $290,151.23 for Termination for Good Reason fees, $100,000 for the AUDT TGE bonus, $72,914.29 for unpaid wages and business expenses incurred, and approximately $15,000 for employment taxes not withheld by the Company in violation of the Internal Revenue Code.

94.     Defendants reaped the benefits of Plaintiff's work and have intentionally acted in a manner to deprive Plaintiff of his right to receive benefits under his Employment Agreement.

95.     Defendants have failed to pay Plaintiff amounts owed under the Employment Agreement and have dismissed all of Plaintiff's attempts to request his earned compensation.

96.     Defendants intended to induce Plaintiff to provide services for Matreya and Auditchain by promising the amounts in the Employment Agreement and now attempt to allege that Plaintiff is not entitled to such amounts.

97.     Defendants' conduct was carried out in bad faith and with improper motive.

98.     Defendants' attempt to evade payment pursuant to the terms of the fully executed Employment Agreement, and after Plaintiff contributed substantial value to the Company in his role, is a breach of the implied covenant of good faith and fair dealing.

99.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer economic harm and other damages.

## **PRAYER FOR RELIEF**

100.     WHEREFORE Plaintiff prays for judgment in his favor and against Defendants, and for the following relief:

       A.     That a finding be entered that Defendants breached the implied covenant of good faith and fair dealing;

       B.     That Plaintiff be awarded damages in an amount equal to the unpaid amounts due and owing;

       C.     That Plaintiff be awarded his costs of maintaining this action, including reasonable attorneys' fees, together with all costs and expenses of suit; and

       D.     That Plaintiff be awarded such other and further relief as this Honorable Court deems necessary.

## **DEMAND FOR JURY TRIAL**

101.     Plaintiff hereby respectfully demands a trial by jury of the allegations contained in this Complaint.

Dated: February 18, 2020

                    Respectfully submitted,

                    By:    /s/ Tristan Loanzon
                             One of the Plaintiff's Attorneys

LOANZON LLP
1345 Avenue of the Americas, 2nd Fl.
New York, New York 10105
(212) 760-1515
tristan@loanzon.com

The Prinz Law Firm, P.C.
Kristen Prinz (kprinz@prinz-lawfirm.com)
Amit Bindra (abindra@prinz-lawfirm.com)
Remy Snead (rsnead@prinz-lawfirm.com)
1 East Wacker Drive, Suite 2500, Chicago, IL 60601
P: (312) 212-4450
F: (312) 284-4822
*Motion for Pro Hac Vice to be Filed*

# Exhibit A



4 September 2018

**VIA EMAIL**

Mr. Chris Danusiar
917 North Cross Street
Wheaton, IL 60187

**Re:     Confidential Term Sheet**

Dear Chris,

This letter and the enclosed summarized terms (together referred to as "Term Sheet") is intended to summarize the terms of an employment agreement ("Employment Agreement") between you and Auditchain USA, Inc., a Delaware corporation ("Auditchain" or the "Company"). Chris Danusiar and Auditchain are each a "Party", both referred to as the "Parties".

This Term Sheet represents a legally binding agreement between the parties hereto regarding the principal terms of Executive's employment and compensation with the Company, which will be evidenced by definitive agreements, including an Employment Agreement. The terms and conditions of the definitive agreements shall be consistent with the terms and conditions set forth herein. The parties agree to negotiate in good faith such definitive documentation containing terms consistent with the provisions set forth herein as soon as reasonably practicable after the date hereof; provided, however, that if such agreements are not entered into between the parties this Term Sheet shall continue in full force and effect.

**SUMMARY TERMS OF EMPLOYMENT AGREEMENT**

| | |
|---|---|
| **Objective** | Chris Danusiar, herein referred to as "Executive" shall serve in the capacity as a Director and the Chief Executive Officer for Auditchain as summarized herein. |
| **Responsibilities** | Executive shall serve as Chief Executive Officer to Auditchain and serve as a member of the board of directors ("Board"). Executive shall oversee the day to day activities of all operations of the Company and have the duties, authorities and responsibilities of persons in similar capacities in similarly sized companies. Such activities shall include overseeing the development of Decentralized Continuous Audit & Reporting Protocol EcosystemTM, the Company's decentralized assurance and reporting product in development as well as guiding the Company's overall strategic plans.  Executive shall work regularly with the Auditchain team at their physical office location(s), but can work remotely or from any Auditchain office location as desired. Executive shall report directly to the Board and all employees of the Company shall report directly to Executive (or his designee). |



The Company (and its shareholders) shall take such action as may be necessary to appoint or elect Executive as a member of the Board as of the date of Executive's commencement of employment.

**Term**          The term of the Employment Agreement shall continue for an initial period of two (2) years, (the "Initial Term"). The Employment Agreement may be mutually extended by the Parties for additional periods of time on mutually satisfactory terms. If Executive's employment continues beyond the Initial Term and the parties have not negotiated an extension, the terms of this Term Sheet (or the definitive Employment Agreement) shall continue to control unless and until a successor agreement has been executed.

**Exclusivity**     Executive shall devote his full time, attention and efforts to the Company; provided that nothing herein shall prevent Executive from (i) serving on the boards of directors of non-profit organizations, (ii) with the consent of the Board (not to be unreasonably withheld, delayed or conditioned), serving on the boards of directors of for-profit companies, (iii) participating in charitable, civic, educational, professional, community or industry affairs, and (iv) managing Executive's personal investments.

**Compensation**   During the Initial Term, Executive shall be paid a cash salary equal to : (i) no less than $225,000 during the first year following the date of Executive's commencement of employment and (ii) no less than $325,000  thereafter ("Salary"). Salary payments shall be made in monthly installments on the first day of each month.

The Company plans to conduct a token generation event ("TGE") within 90 days from the date of this letter. Upon the closing of the TGE, Executive shall be paid a bonus equal to $100,000 (the "TGE Bonus"); provided that the TGE Bonus shall equal $200,000 in the event the gross aggregate proceeds generated from, or arising with respect to, the TGE equal or exceed $5 Million. An additional bonus equal to $200,000 shall be paid upon the commercial launch of the Auditchain blockchain. Executive shall be entitled to the bonuses specified in this paragraph if Executive is providing any services to the Company (whether as a member of the Board, a consultant or otherwise) as of the date of consummation of the TGE or the commercial launch of the Auditchain blockchain, respectively. Further, in the event Executive's employment or service is terminated by the Company without Cause or by Executive with Good Reason upon or with the 120 day period immediately preceding the date of consummation of the TGE or the commercial launch of the Auditchain blockchain, Executive shall be deemed

**AUDITCHAIN**

employed as of the date of such event(s) and entitled to the applicable bonus(es) specified herein.

Executive will be entitled to participate in all employee and fringe benefit plans generally available to executives and employees of the Company.

Executive will be reimbursed for customary business expenses.

Executive shall be entitled to 2,000,000 AUDT tokens ("AUDT"). The Tokens shall vest in the following manner; (i) 500,000 equally on a per block basis over the one year period commencing from the date of the TGE, (ii) 500,000 shall vest immediately upon the date of the commercial release of the genesis block of the Auditchain blockchain ("Genesis Block") , (iii) 500,000 shall vest immediately upon the date of achievement of the first commercial customer and (iv) 500,000 shall vest immediately upon the achievement of an aggregate of $[5,000,000][1] in revenue within any rolling 12 month period, excluding revenue generated directly from the TGE. Executive shall be entitled to the vesting specified in this paragraph if Executive is providing any services to the Company (whether as an employee, member of the Board, consultant or otherwise) as of the date of achievement of the stated milestone, respectively. Further, in the event Executive's employment or service is terminated by the Company without Cause or by Executive with Good Reason upon or with the 120 day period immediately preceding the date of achievement of a milestone, Executive shall be deemed employed as of the date of such event(s) and entitled to the applicable vesting specified herein.

Executive shall be issued a non-qualified option to purchase 10% of the outstanding shares of common stock of Auditchain, calculated on a fully diluted basis as of the date of this Term Sheet ("Option"). The Option shall (a) have an aggregate exercise price of $[100],[2] (b) expire ten (10) years following the date of grant, (c) vest in full upon the earlier of the commercial release of the Genesis Block and a sale of more than 50% of the equity or assets of the Company, and (d) be exercisable at any time prior to expiration. Executive will have the right to "net exercise" the Option that will allow Executive to use shares issuable upon exercise to cover the applicable exercise price and any required tax withholding.  Executive shall be entitled to the vesting specified in this paragraph if Executive is providing any services to the Company (whether as an employee, member of the Board, consultant or otherwise) as of the date of commercial release

---

[1] Confirm expected timeline to achieve this financial hurdle.
[2] Confirm current FMV.



of the Genesis Block. Further, in the event Executive's employment or service is terminated by the Company without Cause or by Executive with Good Reason upon or with the 120 day period immediately preceding the date of commercial release of the Genesis Block, Executive shall be deemed employed as of the date of such event and entitled to the vesting specified herein.

**Termination**

In the event of Executive's termination of employment for any reason, Executive will be entitled to receive (i) any unpaid base salary through the date of termination, (ii) any bonus earned but unpaid with respect to a performance period (or event) ending on or preceding the date of termination, payable at the same time as it would have been paid had Executive not undergone a termination of employment, (iii) reimbursement for any unreimbursed business expenses incurred through the date of termination, (iv) any accrued but unused vacation time, and (v) all other payments or benefits to which Executive is entitled under the terms of this Term Sheet and any applicable compensation or equity arrangement or employee benefit plan or program of the Company (collectively, the "Accrued Benefits").

In addition, in the event of Executive's termination of employment from the Company by the Company without Cause or by Executive for Good Reason, in addition to the Accrued Benefits, the Company will pay or provide Executive with (i) an aggregate amount equal to the base salary that would have been paid to Executive had his employment continued under the terms of this Term Sheet for one year following the date of termination (taking into account the mandatory increase upon the first anniversary of Executive's start date), payable in a single lump sum within 10 days following the date of termination and (ii) continued participation in the Company's health, dental and benefit plans for a period of one year following the date of termination of employment. In no event will Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to Executive under any of the provisions of this Term Sheet.

For purposes hereof, "Cause" means (i) Executive's willful misconduct or gross negligence in the performance of Executive's duties to the Company that has a material adverse effect on the Company; (ii) Executive's conviction of, or pleading of guilty or nolo contendere to, a felony; (iii) Executive's willful performance of any material act of embezzlement or fraud against the Company; or (iv) Executive's willful, material breach of this Term Sheet. Any determination of Cause by the Company will be made by a resolution approved by a majority of the members of the Board, provided that no such determination may be made until Executive has been given

**AUDITCHAIN**

written notice detailing the specific Cause event and a period of 30 days following receipt of such notice to cure such event. For purposes hereof, an act, or a failure to act, shall not be deemed willful or intentional, unless it is done, or omitted to be done, by Executive in bad faith or without a reasonable belief that Executive's action or omission was in the best interest of the Company.

For purposes hereof, "Good Reason" means, unless otherwise agreed to in writing by Executive, (i) any diminution or adverse change in Executive's titles, duties, responsibilities or authorities; (ii) a reduction in Executive's Base Salary, bonus opportunities or equity-based compensation; (iii) a permanent relocation of Executive's primary place of employment by more than 25 miles; (iv) Executive's removal from the Board (or the Company's failure to appoint or elect Executive to the Board); or (v) any material breach by the Company of the terms of this Term Sheet (including any breach of the provisions set forth in the "Indemnification and Insurance" section set forth below) or any other agreement between Executive and the Company. In order to invoke a termination for Good Reason, (A) Executive must provide written notice within 90 days of the occurrence of any event of "Good Reason," (B) the Company must fail to cure such event within 30 days of the giving of such notice and (C) Executive must terminate employment within 30 days following the expiration of the Company's cure period.

|                        |                                                                                                                                                                                                                                                                       |
| ---------------------- | --- |
| **Non-Competition**    | Executive shall not compete directly with the business of Auditchain, namely the development and deployment of a decentralized continuous audit and reporting protocol ecosystem, during the Term and for a period of one year following the termination of the Employment Agreement. |
| **Right of First Refusal** | If the Employment Agreement is terminated by the Company for Cause, during the 90 day period immediately following the date of such termination of employment, Auditchain shall have the exclusive right to purchase Executive's equity interest in Auditchain. If such event occurs, Auditchain shall repurchase Executive's interest immediately for cash at a price equal to the per share Fair Market Value. |

"Fair Market Value" shall mean the product of (x) two (2) multiplied by (y)(A) NTBV minus (B) the value of the unallocated and unsold tokens made by the Company in the TGE. For this purpose, "NTBV" shall mean the total assets (exclusive of goodwill and similar intangible assets) minus total liabilities, as determined consistent with General Accepted Accounting Principles (GAAP). The Company will provide to Executive its calculation of Fair Market Value. Notwithstanding the foregoing or the methodology for

**AUDITCHAIN**

determining Fair Market Value set forth herein, if Executive believes that the Fair Market Value is greater than the Fair Market Value as determined above, Executive may elect to direct the Company to obtain an appraisal of the Fair Market Value, which appraisal shall be prepared by a qualified independent appraiser, mutually selected by the Company and Executive. If the Company and Executive are unable to agree on such appraiser, they shall each select a qualified independent appraiser, and the two such appraisers shall select a third qualified independent appraiser, which third appraiser shall prepare the determination of Fair Market Value. Such election must be in writing and given to the Company within thirty (30) days after Executive receives the Company's determination of Fair Market Value. The determination of the appraiser shall be a final and binding determination of Fair Market Value. If such appraiser determines Fair Market Value to be 110% or more of the Fair Market Value determined by the Company, then the Company shall pay the cost of all such appraisers. If such appraiser determines the Fair Market Value to be less than 110% of the Fair Market Value determined by the Company, then Executive shall pay the cost of all such appraisers.

**Confidentiality**

As per the Confidentiality Agreement entered into between the Parties on May 26, 2018, except as permitted or required by law, no information regarding this Term Sheet, including without limitation, any matters that are or may be the subject of discussions among the Parties in relation to the existence and the contents of this Term Sheet, shall be disclosed or made public by either Party without the prior written consent of the other Party, except that it may be shared with attorneys of the Parties who shall also keep all such matters confidential.  The confidentiality commitment of the Parties shall survive the termination of negotiations among them.

**Indemnification and Insurance**

If Executive is made or threatened to be made a party to or a participant in any actual, threatened, pending, or completed action, claim, or proceeding of any type, the Company shall indemnify, defend, and hold Executive harmless to the maximum extent authorized or permitted by applicable law and by the Company's Stockholders Agreement, Certificate of Incorporation, By-Laws, and all other organizational documents of the Company, as the foregoing may be amended from time to time to increase or enhance Executive's right(s) to indemnification. Executive's right to indemnification shall include any and all expenses (including advancement and payment of attorneys' fees) and losses arising out of or relating to any of Executive's actual or alleged acts, omissions, negligence or active or passive wrongdoing, including, the advancement of expenses Executive incurs. In all events, without limiting the foregoing, the Company shall provide Executive with

 AUDITCHAIN

indemnification on terms no less favorable than provided to any other executive officer or director of the Company. Such indemnification shall continue even if Executive has ceased to be a director, officer, equityholder, or employee of the Company and shall inure to the benefit of Executive's heirs, executors and administrators. Further, in the event Executive prevails on any material issue in connection with any controversy, dispute or claim which arises out of or relates to this Term Sheet, any other agreement or arrangement between Executive and the Company, Executive's employment with the Company, or the termination thereof, then the Company shall reimburse Executive (and Executive's beneficiaries) for any and all costs and expenses (including attorneys' fees) incurred by Executive (or any of Executive's beneficiaries) in connection with such controversy, dispute or claim.

In addition, during Executive's employment with the Company and while potential liability exists (but in no event less than six years thereafter), the Company or any successor to the Company shall maintain, at its own expense, (i) directors' and officers' liability insurance, (ii) errors and omissions liability insurance, and (iii) such other insurance that a company operating in the Company's industry should maintain, including a company engaging in a TGE (collectively, the "Applicable Insurance Coverage"), in each case, providing coverage to Executive on terms that are no less favorable than the coverage provided to other directors and officers of Company (but in no event less than a reasonable amount of coverage). The Company shall procure the Applicable Insurance Coverage as soon as reasonably practicable following the date hereof, but in no event later than by August 31, 2018. The Executive's rights under this section shall survive the termination of this Term Sheet and the termination of Executive's employment and service with the Company. From time to time, as requested by Executive, the Company shall provide evidence that all insurance coverage or extended reporting endorsements, as required herein, are in effect.

If the Company fails to obtain or maintain the Applicable Insurance Coverage as provided above (whether during Executive's employment or thereafter), Executive may, in his sole discretion, unilaterally obtain all or any portion of the Applicable Insurance Coverage (which may include retroactive coverage dates) and the Company shall immediately reimburse Executive on an after-tax basis for all costs of obtaining and maintaining such coverage. Such remedy(ies) shall not be exclusive.

**Governing Law**        The Laws of the United States and the State of New York shall govern this Term Sheet.

 AUDITCHAIN

**Miscellaneous**    No provision of this Term Sheet may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by Executive and such officer or director as may be designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Term Sheet to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. Whenever in this Term Sheet the words "including" or "include" is used, it shall be deemed to be for purposes of identifying only one or more of the possible alternatives, and the entire provision in which such word appears shall be read as if the phrase "including without limitation" were actually used in the text.

No party may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party hereto.

The intent of the parties is that payments and benefits under this Term Sheet comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder and, accordingly, to the maximum extent permitted, this Term Sheet shall be interpreted to be in compliance therewith.

This Term Sheet may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

AGREED TO AND ACCEPTED BY:

_Chris Danusiar_
_____
Chris Danusiar

Date : ___17 August 2018___

_____
Auditchain USA, Inc.

Jason Meyers,
Chief Executive Officer

Date: _____